■ JACK SHAFRAN et al., Appellants, v ST. VINCENT'S HOSPITAL AND MEDICAL CENTER et al., Respondents. [694 NYS2d 642] —Judgment, Supreme Court, New York County (Carol Huff, J.), entered January 23, 1998, dismissing the complaint as against defendant St. Vincent's Hospital at the close of the evidence, and against defendants Janick, Nathanson and Burns after a jury verdict in their favor, unanimously reversed, on the law, the facts and in the exercise of discretion, without costs, the judgment vacated, the complaint reinstated against all defendants and a new trial ordered.

In this medical malpractice action, the following facts were established at trial. Plaintiff's decedent, Betty Shafran, sustained serious injuries and eventually died after receiving electroconvulsive therapy (ECT) while in defendants' care. The ECT was prescribed as treatment for Shafran's chronic depression. In July 1990, Shafran was admitted to St. Vincent's Hospital by her internist, defendant Margaret Burns, M.D., after Shafran complained of respiratory problems. Shafran had pneumonia and was in respiratory distress. She was intubated and received a full pulmonary consultation by a pulmonologist. Shafran was also continued on the drug theophylline, a bronchodilator commonly used to treat lung diseases. Upon her release, she was diagnosed with chronic obstructive pulmonary disorder.

On August 27, 1990, Shafran voluntarily returned to the hospital suffering from severe depression. She was admitted to the psychiatric department under the care of defendant Mark Nathanson, M.D., a psychiatrist. Dr. Nathanson testified that although the theophylline was stabilizing Shafran's respiratory condition, the anti-depressant medications she was taking were ineffective and Shafran's psychiatric condition was deteriorating.

Dr. Nathanson engaged in a risk-benefit analysis to determine if Shafran was a viable candidate for ECT, a treatment she had received in the 1960's with some success. The analysis included consultations with several specialists including a cardiologist and pulmunologist, and various laboratory tests. Dr. Nathanson consulted Dr. Burns regarding Shafran's pulmonary condition, since the pulmonologist who examined her in July was unavailable.

Doctors Nathanson and Burns testified that they considered whether Shafran should be taken off theophylline before the ECT, or the dosage decreased, since theophylline can lower a person's seizure threshold. Both doctors knew that if a patient's theophylline blood-level is above the therapeutic range (10-20 mcgs.), an increased risk of spontaneous prolonged seizures, or status epilepticus, is present during ECT. Blood-levels taken from Shafran on August 29th and August 30th were in the therapeutic range, and, in anticipation of the ECT, Dr. Burns reduced Shafran's dosage of theophylline from 400 to 300 mg. Although Shafran's blood level was not taken again prior to the September 7th ECT procedure, Dr. Burns and Dr. Nathanson testified that the 25% reduction in theophylline would result in reduction of the blood-level of the medication to within the therapeutic range.

The ECT was performed by Dr. Nathanson on September 7th. He was assisted by defendant Richard Janick, M.D., an anesthesiologist. Dr. Nathanson induced the intended seizure from Shafran, but shortly after Shafran began suffering status epilepticus that lasted for several hours. At one point, Dr. Nathanson left the ECT-treatment room to obtain assistance. Shafran lapsed into a coma for approximately 10 days, and sustained permanent injuries including bi-lateral deafness, memory loss and seizure disorder. These injuries persisted until she died 6 years later.

Shafran's husband, Jack, commenced the instant medical malpractice action against St. Vincent's Hospital, and Doctors Burns, Janick and Nathanson. He alleged numerous departures from acceptable medical practice including the failure to consider alternative treatments for Shafran's depression; the failure to adequately consider Shafran's pulmonary condition and to obtain a pulmonary consult by a specialist prior to the ECT; the failure to consult other physicians about discontinuing or lowering the dosage of theophylline; the failure to take Shafran's blood-levels shortly before the ECT; and the failure to properly monitor the ECT procedure and control the status epilepticus. The defendants denied the allegations of malpractice.

A trial was held in late 1997. At the close of the evidence, the trial court dismissed the action against St. Vincent's, finding that there was no showing that any of the doctors were employed by the hospital. The jury returned a verdict in favor of defendant doctors.

On appeal, plaintiff's main argument is that the trial court's preclusion of his three expert medical witnesses on the ground that their testimony would have been cumulative to the testimony of plaintiff's expert, Dr. Harold Sackheim, who did testify, was erroneous. Dr. Sackheim was a psychologist, not a psychiatrist, and was not authorized to conduct ECT. He was, however, a recognized expert in the field of ECT.* While defendants sought preclusion of Dr. Sackheim's testimony because he was not a *medical* doctor, the court permitted him to testify as to the standard in the community for the use of ECT, with a warning to plaintiff's counsel that it would not al-

---

* Dr. Sackheim is a Ph.D. in clinical psychology and experimental psychopathology, and a professor in the psychiatry and radiology departments at the Columbia Presbyterian Medical Center. He was chief of the Department of Biological Psychiatry at the New York State Psychiatric Institute, and was also an advisor to the American Psychiatric Association's Task Force on ECT, co-authoring its 1990 report.

low additional experts to give repetitive testimony. When plaintiff sought to call three expert medical witnesses, a pulmonologist, a psychiatrist and a neurologist, the court, after hearing extensive offers of proof, granted defendants' application to preclude their testimony as cumulative to Dr. Sackheim's. Defendants, in contrast, were permitted to call medical experts in each specialty, and were allowed to argue in summation that plaintiff's expert was unreliable because he was not a medical doctor. Plaintiff argues that this was an unfair exploitation of the court's preclusion order, and that much of the evidence he was offering was not cumulative. Defendants counter that plaintiff charted his own course by relying on Dr. Sackheim's extensive testimony despite the court's warning, and may not now complain about the preclusion of cumulative testimony.

"It is well settled that whether evidence should be excluded as cumulative rests within the sound discretion of the trial court" (*Berry v Jewish Bd. of Family & Children's Servs.*, 173 AD2d 670, 671; *see also*, *Abbott v New Rochelle Hosp. Med. Ctr.*, 141 AD2d 589, 591, *lv denied* 72 NY2d 808; *Irrizary v City of New York*, 95 AD2d 713). However, the court's blanket preclusion of plaintiff's three expert medical witnesses was an improvident exercise of discretion. Although Dr. Sackheim gave extensive testimony concerning ECT, the risk-benefit analysis and several departures by the doctors from acceptable ECT practices, plaintiff's counsel identified several crucial subjects which Dr. Sackheim did not address or was precluded from addressing because he was not a medical doctor. For example, plaintiff's pulmonologist would have testified on whether Shafran's pulmonary condition rendered her unfit for ECT, and whether Shafran could have been safely taken off theophylline in order to reduce the risk of prolonged seizures during ECT. Dr. Sackheim could not, and did not, give a medical opinion on these issues. Thus, plaintiff was denied the opportunity to rebut the defendant's medical testimony (from a pulmonologist) that Shafran was fit for ECT, and that she could not have been safely taken off theophylline.

Plaintiff also sought to call a psychiatrist to testify about Shafran's psychological condition prior to ECT, and whether any alternative, less dangerous forms of treatment were available for Shafran's depression. Dr. Nathanson had testified that Shafran's psychiatric condition was an emergency and that ECT was necessary. Plaintiff's counsel argued that expert psychiatric testimony was needed to challenge this assertion, and was also necessary to support plaintiff's claim that Dr.

Nathanson acted negligently when complications developed during the ECT procedure. However, the court improperly ruled that Dr. Sackheim's testimony had fully covered these areas, and that a psychiatrist's testimony was not needed.

Perhaps most prejudicial was the preclusion of plaintiff's neurologist. Plaintiff sought to establish through this witness that the negligently performed ECT procedure was the proximate cause of Shafran's injuries, and to question the neurologist concerning the neurological and radiological data, such as CAT scans taken subsequent to the ECT procedure. Not only did the court preclude plaintiff's neurologist from testifying, it allowed defendants' expert neurologist to testify to an entirely new theory of causation for plaintiff's injuries. Defendants' neurologist posited that Shafran's injuries resulted from a congenital vascular malfunction of the brain, and not from ECT or theophylline. Although there is mention of a vascular malfunction in Shafran's autopsy report, this theory of causation was never mentioned in any of defendants' pretrial expert witness notices, and was first disclosed during defense counsel's opening statement. Moreover, it was not until one week into the trial, when defendants served an additional expert witness notice, that this new theory of causation was connected to any particular expert's testimony. Plaintiff's claims of unfair surprise are well grounded. At a minimum, plaintiff should have been permitted to call his neurologist on rebuttal, to respond to this new theory of causation (*see, Herrera v V.B. Haulage Corp.*, 205 AD2d 409, 410; *see also, Benjamin v Desai*, 228 AD2d 764, 766; *Harding v Noble Taxi Corp.*, 182 AD2d 365, 370).

While a trial court must not allow cumulative or repetitive testimony, the preclusion rulings here were overbroad and severely prejudiced plaintiff's ability to prove his case. Although there was potential for significant overlap between Dr. Sackheim's testimony and that of the medical witnesses, the better remedy would have been to limit the subsequent experts' testimony to material not covered by the first witness (*see, Abbott v New Rochelle Hosp. Med. Ctr.*, *supra*, at 591). Accordingly, the complaint is reinstated against the defendant doctors.

The IAS Court also erred in dismissing the action against St. Vincent's. A hospital may be held vicariously liable for the negligence or malpractice of physicians who act in its employ or as its agents (*see, Hill v St. Clare's Hosp.*, 67 NY2d 72, 79). While mere affiliation with a hospital is insufficient to impute a doctor's negligence to a hospital (*Hill v St. Clare's Hosp.*,

*supra*; *Nagengast v Samaritan Hosp.*, 211 AD2d 878, 879; *Tuzeo v Hegde*, 172 AD2d 747, 748), there is evidence in the record suggesting that Doctors Nathanson and Janick were more than just affiliated with St. Vincent's. Dr. Nathanson admitted during his testimony that he had an office in the hospital, and that he had been paid by it. His insistence that he was a private attending physician, and not an employee, simply raises a credibility issue which the jury should have been permitted to resolve. As to Dr. Janick, hospital records were introduced showing that in 1983 he had applied for a position on the hospital's "Medical Staff", and in 1989 he applied for renewal of his attending privileges. This was some evidence that Dr. Janick had been employed by the hospital during the relevant time period. Because the proof as a whole is equivocal as to whether these doctors were in fact employees of the hospital, the court should not have decided the issue as a matter of law.

Moreover, even if the doctors were not employees of the hospital, it may be vicariously liable for the acts of independent physicians where a patient enters the hospital through the emergency room and seeks treatment from the hospital, not from a particular physician (*see, Citron v Northern Dutchess Hosp.*, 198 AD2d 618, 620, *lv denied* 83 NY2d 753; *Mduba v Benedictine Hosp.*, 52 AD2d 450, 453). Here, Shafran walked into St. Vincent's on her own, in a state of severe depression. She did not request a specific doctor, and it was through the hospital that Dr. Nathanson began treating her. Under these circumstances, there is a question as to whether Shafran "could properly assume that the treating doctors and staff of the hospital were acting on behalf of the hospital" (*Mduba v Benedictine Hosp.*, *supra*, at 453). The complaint is also reinstated against the hospital.

Because we are ordering new trial as to all defendants, we need not address plaintiff's additional claims of error. Concur—Nardelli, J. P., Tom, Mazzarelli and Lerner, JJ.